# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GRACE GARCIA,<br><br>            Plaintiff,<br><br>    v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>            Defendant. | Case No. 1:20-cv-00373-SAB<br><br>ORDER GRANTING IN PART PLAINTIFF'S SOCIAL SECURITY APPEAL AND REMANDING FOR FURTHER PROCEEDINGS<br><br>(ECF Nos. 19, 23, 24) |

## I.

## INTRODUCTION

Grace Garcia ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for disability benefits pursuant to the Social Security Act. The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to Magistrate Judge Stanley A. Boone.[1]

For the reasons set forth below, Plaintiff's Social Security appeal shall be granted in part.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff protectively filed an application for a period of disability and disability insurance benefits on June 3, 2016. (AR 118.) Plaintiff's application was initially denied on July 29, 2016,

---

[1] The parties have consented to the jurisdiction of the United States Magistrate Judge and this action has been assigned to the undersigned for all purposes. (See ECF Nos. 7, 8, 22.)

and denied upon reconsideration on February 27, 2017.  (AR 133-136, 138-142.)  Plaintiff requested and received a hearing before Administrative Law Judge Ruxana Meyer ("the ALJ"). Plaintiff appeared for a hearing on November 6, 2018.  (AR 36-71.)  On January 30, 2019, the ALJ found that Plaintiff was not disabled.  (AR 12-30.)  The Appeals Council denied Plaintiff's request for review on January 6, 2020.  (AR 1-3.)

### A.     Relevant Hearing Testimony

Plaintiff appeared with counsel and testified at the November 6, 2018 hearing.  (AR 40-63.)  Plaintiff lives with her husband in Selma, California.  (AR 40.)  Plaintiff's husband works and she is home by herself during the day unless her sister comes by to help her.  (AR 41.)  Her sister comes by probably three times per week.  (AR 41.)  She will help Plaintiff get up, pick up the house, and clean.  (AR 41.)  If she cannot come during the day she will come in the evening and bring dinner or have Plaintiff get up and help make dinner.  (AR 41.)  Her sister will help Plaintiff with the laundry and says she is keeping Plaintiff company, but she helps Plaintiff out. (AR 41.)  Her sister is battling the same stuff so she helps Plaintiff out.  (AR 41.)  Her sister is not on disability but has some of the same stuff that Plaintiff has.  (AR 41.)

Plaintiff was 55 years old on the date of the hearing.  (AR 42.)  She graduated from high school, attended two years of technical college, and did a secretarial program.  (AR 42.)  She graduated with a certificate as a career secretary in 1981.  (AR 42.)  Plaintiff worked for Steve Wilson Produce doing customer sales and inspecting fruit from 2004 to 2012.  (AR 43.)  She would lift 20 to 30 pounds.  (AR 43.)  Plaintiff's job ended because she was not performing her job due to being on pain medication.  (AR 44.)  She was misusing her pain medication and went into rehab in 2012.  (AR 44.)  On some days, Plaintiff would be buying all day and other days she would go to different cold storage facilities and would load and buy.  (AR 45.)  Plaintiff also worked as a fruit inspector at Royal Fruit until 2004.  (AR 45.)

In 2013, Plaintiff went to work at California Wok for a friend.  (AR 45.)  She was waitressing but it was difficult to be on her feet and carry things.  (AR 45.)  The job only lasted a couple weeks and she was let go.  (AR 45.)  She was not able to make it through the day without having to take extra breaks.  (AR 45.)

Plaintiff is unable to work due to pain in her body.  (AR 46.) The pain is unpredictable and comes fast.  (AR 46.)  Her back hurts, and sitting for long periods of time is not good.  (AR 46.)  Plaintiff can sit for thirty minutes at a time before having to get up.  (AR 46.)  She can stand for 45 minutes, but would be in pain after 30 minutes.  (AR 46-47.)  Plaintiff can walk for one block and then would need to sit down.  (AR 47.)  She can walk for thirty to thirty five minutes.  (AR 47.)  After thirty minutes her fees hurt and her back will start hurting.  (AR 47.)

Plaintiff was seeing Dr. Chann who told Plaintiff that she needed to go to a meditation class in order for Dr. Chann to continue seeing her.  (AR 48.)  Plaintiff could not afford it so she stopped going to Dr. Chann.  (AR 48.)  She did not see another psychiatrist.  (AR 48.)  She just went to Dr. Sievert one time and he seems like a good fit.  (AR 48.)

Plaintiff's husband or sister handle her medication for her.  (AR 50.)  She has drowsiness and seems to forget things.  (AR 50.)  She will be talking to someone and just forgets and gets off track.  (AR 50.)  Plaintiff is not taking any kind of pain medication and is having side effects from the other medications.  (AR 50.)  She is taking Gabapentin and it causes drowsiness.  (AR 50.)  She has trouble sleeping at night and will doze off during the day.  (AR 50.)

Plaintiff does not do anything during the day other than going for a walk.  (AR 50-51.)  Her anxiety is so bad she does not want to be around people.  (AR 51.)  Most of the time, Plaintiff is either resting, laying down, or will try to do laundry.  (AR 51.)  Plaintiff will put in a load of laundry and then go sit down and fold it.  (AR 51.)  She will try to read but her concentration is not very good.  (AR 51.)  She has not finished a book in a while.  (AR 51.)  She has side effects of diarrhea, stomach pain, and gets acid reflux from all the medications she is taking.  (AR 51.)  Plaintiff has diarrhea maybe three or four days a week.  (AR 51.)  She will go to the bathroom four or five times a day.  (AR 51.)  Plaintiff wears depends because of her bladder.  (AR 52.)  She feels the need to urinate quickly also.  (AR 52.)  She has frequency urinating two or three days a week.  (AR 52.)  On those days, she will go to the bathroom eight or nine times.  (AR 52.)  It takes her ten minutes to go to the bathroom and get back.  (AR 52.)  If she is having diarrhea, it will take fifteen minutes.  (AR 53.)  She was just diagnosed last month with irritable bowel syndrome.  (AR 53.)  She started having problems in December of 2017.

(AR 53.)

Plaintiff has pain in her upper neck, back, and shoulders and nerve pain in both of her arms and knees. (AR 53.) She has carpal tunnel in both hands and they get stiff and hurt. (AR 54.) Her right hand is worse than the left. (AR 54.) Every day, she has pain in her hands, feet, knees, and back that are sharp and stabbing and sometimes throbbing. (AR 54.) The pain is not severe every day, it will be six or seven out of ten. (AR 54.) Plaintiff has severe pain two or three days a week. (AR 54.) On those days, she does not do anything. (AR 54.) The pain is very unpredictable and she is not aware of anything that triggers it. (AR 55.) On bad days, the pain is more intense, but lasts about the same. (AR 55.) It comes in the evening a lot if she has walked. (AR 55.) To deal with the pain, Plaintiff will either rest or sit or sleep in her recliner. (AR 55.) Plaintiff is resting or laying down for six hours in a day. (AR 55.) She will be watching television, or sitting down and reading or listening to meditation music. (AR 55.)

Plaintiff is able to bend over and pick up something that is dropped but it would be uncomfortable. (AR 56.) She can climb a flight of stairs. (AR 56.) She is able to walk on uneven surfaces. (AR 56.) She is not very steady on gravel. (AR 56.) Plaintiff can move her head from side to side and touch her chin to her shoulder. (AR 56.) She is able to turn around. (AR 56.) Plaintiff is able to hold up her head with her neck to watch television, but it seems like her head weighs a ton and her neck is always hurting. (AR 57.) She will need to take a break after maybe thirty minutes for ten minutes. (AR 57.) Her hands are stiff and achy due to the carpal tunnel. (AR 57.) Plaintiff is able to hold a pen or pencil, but has difficulty opening things. (AR 57.) Her husband will open water bottles and leave them for her in the refrigerator. (AR 57.) Plaintiff is able to hold eight or nine pounds with her right hand and five or six pounds with her left hand. (AR 57-58.) Plaintiff would be able to consistently use her hands for ten to fifteen minutes before needing a break for ten minutes. (AR 58.) Plaintiff's physical problems are magnified because she is not able to take pain medication. (AR 58.)

She takes Gabapentin which helps, but it causes her to be drowsy and lethargic. (AR 59.) Plaintiff has depression every couple days and some days it is worse than others. (AR 59.) She will isolate and not want to be around anyone. (AR 59.) Plaintiff will stay in her pajamas all day

4

and will put some clothes on before her husband gets home. (AR 59.) If she is in her pajamas when he gets home then he knows that is not a food sign. (AR 59.) Plaintiff does a lot of crying and has ugly thoughts. (AR 60.) She wishes she was dead and would have overdosed or something. (AR 60.) She has suicidal thoughts a couple times a month. (AR 59.)

Plaintiff makes sure to keep in contact with her sponsor every couple days. (AR 60.) Plaintiff used to go to meetings and it is hard for her to get out and go. (AR 60.) Most of the time she is dozing off and it scares her to drive so she does not. (AR 60.) Her sister will drive her or someone else will do the errands. (AR 60.) Her mother will go with her to make sure that Plaintiff is okay. (AR 61.) Plaintiff's mother does not drive, she just goes with Plaintiff to her doctor's appointments. (AR 61.) Plaintiff has anxiety every day. (AR 61.) It causes isolation. (AR 61.) She has anxiety about going somewhere and not being able to use the restroom or having an accident. (AR 61.) She started carrying clothes in the trunk of her care in case she has an accident. (AR 61.) Plaintiff has panic attacks around people. (AR 61.) Her husband likes to go to the movies and it is okay when it is dark and they are watching a movie but getting there is difficult for Plaintiff. (AR 61.)

Plaintiff's husband usually does the grocery shopping. (AR 62.) If Plaintiff is out for a doctor's appointment, she will stop and pick up a couple of things. (AR 62.) Her husband handles their finances. (AR 62.) Plaintiff is able to watch television for thirty minutes and then she will go and take a load out of the dryer and then come back and watch television or read. (AR 62.) She will just take a short break, maybe ten minutes. (AR 62.) Once or twice a week, Plaintiff has a day where she does not get out of bed. (AR 62.) On those days, the pain medication is not helpful. (AR 62.) Her doctor has allowed her to take a sleeping pill and sleeping during the day. (AR 63.)

Plaintiff has been diagnosed with rheumatoid arthritis and has had symptoms all along. (AR 63.) The fibromyalgia causes not just her muscles and joints to ache, but her hands and feet. (AR 63.) On a typical day, Plaintiff has to put in a lot of effort just to get through the day. (AR 63.) Plaintiff will do laundry and do some cooking. (AR 63.) When she is depressed, it all shuts down. (AR 63.)

Paul Stanford, a vocational expert also testified at the hearing.  (AR 64-69.)

**B.     ALJ Findings**

The ALJ made the following findings of fact and conclusions of law.

- Plaintiff last met the insured status requirements of the Social Security Act on December 31, 2017.

- Plaintiff did not engage in substantial gainful activity (SGA) during the period from her alleged onset date of June 20, 2013, through December 31, 2017, the date last insured.

- Plaintiff had the following severe impairments: a mood disorder with depression; generalized anxiety disorder; opioid abuse with physiological dependence; rheumatoid arthritis; and fibromyalgia.

- Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.

- After careful consideration of the entire record, through the date last insured, Plaintiff had the residual functional capacity to perform work as follows: lift 20 pounds occasionally and lift and carry 10 pounds frequently; stand and/or walk for six hours in an eight-hour workday; and sit for about six hours in an eight-hour workday.  Plaintiff can perform simple, repetitive tasks.

- Through the date last insured, Plaintiff was unable to perform any past relevant work.

- Plaintiff was born on October 3, 1963, and was 54 years old, which is defined as an individual closely approaching advanced age, on the date last insured.

- Plaintiff has at least a high school education and is able to communicate in English.

- Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that Plaintiff is "not disabled," whether or not she has transferable job skills.

- Through the date last insured, considering Plaintiff's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that she could have performed.

- Plaintiff was not under a disability, as defined in the Social Security Act, at any time

from June 20, 2013, the alleged onset date, through December 31, 2017, the date last insured.

(AR 17-30.)

## III.

## LEGAL STANDARD

To qualify for disability insurance benefits under the Social Security Act, the claimant must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security Regulations set out a five step sequential evaluation process to be used in determining if a claimant is disabled. 20 C.F.R. § 404.1520; Batson v. Commissioner of Social Security Administration, 359 F.3d 1190, 1194 (9th Cir. 2004). The five steps in the sequential evaluation in assessing whether the claimant is disabled are:

> Step one: Is the claimant presently engaged in substantial gainful activity? If so, the claimant is not disabled. If not, proceed to step two.
>
> Step two: Is the claimant's alleged impairment sufficiently severe to limit his or her ability to work? If so, proceed to step three. If not, the claimant is not disabled.
>
> Step three: Does the claimant's impairment, or combination of impairments, meet or equal an impairment listed in 20 C.F.R., pt. 404, subpt. P, app. 1? If so, the claimant is disabled. If not, proceed to step four.
>
> Step four: Does the claimant possess the residual functional capacity ("RFC") to perform his or her past relevant work? If so, the claimant is not disabled. If not, proceed to step five.
>
> Step five: Does the claimant's RFC, when considered with the claimant's age, education, and work experience, allow him or her to adjust to other work that exists in significant numbers in the national economy? If so, the claimant is not disabled. If not, the claimant is disabled.

Stout v. Commissioner, Social Sec. Admin., 454 F.3d 1050, 1052 (9th Cir. 2006).

Congress has provided that an individual may obtain judicial review of any final decision of the Commissioner of Social Security regarding entitlement to benefits. 42 U.S.C. § 405(g). In reviewing findings of fact in respect to the denial of benefits, this court "reviews the

Commissioner's final decision for substantial evidence, and the Commissioner's decision will be disturbed only if it is not supported by substantial evidence or is based on legal error." Hill v. Astrue, 698 F.3d 1153, 1158 (9th Cir. 2012). "Substantial evidence" means more than a scintilla, but less than a preponderance. Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996) (internal quotations and citations omitted). "Substantial evidence is relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion." Thomas v. Barnhart, 278 F.3d 947, 955 (9th Cir. 2002) (quoting Flaten v. Sec'y of Health & Human Servs., 44 F.3d 1453, 1457 (9th Cir. 1995)).

"[A] reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." Hill, 698 F.3d at 1159 (quoting Robbins v. Social Security Administration, 466 F.3d 880, 882 (9th Cir. 2006). However, it is not this Court's function to second guess the ALJ's conclusions and substitute the court's judgment for the ALJ's. See Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) ("Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld.").

## IV.

## DISCUSSION AND ANALYSIS

Plaintiff contends that the ALJ erred by failing to provide clear and convincing reasons to reject her symptom testimony and by disregarding the opinion of her treating physicians. Defendant counters that the ALJ properly explained the weight that was provided to the treating physician opinion and why more weight was provided to the other medical opinions which were more consistent with the record.

### A. Physician Testimony

Plaintiff argues that the ALJ erred by failing to provide specific and legitimate reasons to request the opinions of Plaintiff's treating physicians Dr. Barry and Dr. Guzzetta. Plaintiff contends that the reason provided by the ALJ that the medical record demonstrate normal findings shows a misunderstanding of fibromyalgia.

Defendant counters that Plaintiff misunderstands the ALJ's reasoning. Defendant argues

that the ALJ found that Plaintiff's fibromyalgia was a severe impairment, but that the issue at this stage of the analysis is whether Plaintiff's impairments are disabling and the long history of normal examinations is consistent with the finding that Plaintiff is able to perform light work. Defendant argues that the medical record does not demonstrate that Plaintiff consistently suffered from common symptoms of fibromyalgia such as chronic pain, multiple tender points, fatigue and stiffness.

Plaintiff counters that Defendant did not offer any response to her argument that the ALJ failed to apply the correct legal standard.

The weight to be given to medical opinions depends upon whether the opinion is proffered by a treating, examining, or non-examining professional. See Lester v. Chater, 81 F.3d 821, 830-831 (9th Cir. 1995). In general a treating physician's opinion is entitled to greater weight than that of a nontreating physician because "he is employed to cure and has a greater opportunity to know and observe the patient as an individual." Andrews v. Shalala, 53 F.3d 1035, 1040-41 (9th Cir. 1995) (citations omitted). If a treating physician's opinion is contradicted by another doctor, it may be rejected only for "specific and legitimate reasons" supported by substantial evidence in the record. Ryan v. Commissioner of Social Sec., 528 F.3d 1194, 1198 (9th Cir. 2008) (quoting Bayliss v. Barnhart, 427 F.3d 1211, 1216 (9th Cir. 2005)).

Where the treating physician's opinion is contradicted by the opinion of an examining physician who based the opinion upon independent clinical findings that differ from those of the treating physician, the nontreating source itself may be substantial evidence, and the ALJ is to resolve the conflict. Andrews, 53 F.3d at 1041. However, if the nontreating physician's opinion is based upon clinical findings considered by the treating physician, the ALJ must give specific and legitimate reasons for rejecting the treating physician's opinion that are based on substantial evidence in the record. Id.

The contrary opinion of a non-examining expert is not sufficient by itself to constitute a specific, legitimate reason for rejecting a treating or examining physician's opinion, however, "it may constitute substantial evidence when it is consistent with other independent evidence in the record." Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001). The ALJ need not accept

the opinion of any physician that is brief, conclusory, and unsupported by clinical findings. Thomas, 278 F.3d at 957.

Plaintiff argues that the ALJ's reasoning that the opinions of her treating providers were inconsistent with the medical evidence is legally insufficient. However, the ALJ can meet his "burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989) (quoting Cotton v. Bowen , 779 F.2d 1403, 1408 (9th Cir. 1989)).

    1.   ALJ's Consideration of Medical Evidence

The Court finds no merit to Plaintiff's argument that the ALJ only referenced 4 pages of medical treatment notes in the 343 page medical record.

The ALJ first summarized the medical evidence of record that was germane to the period from June 20, 2013 through December 31, 2017. (AR 22-24.) The ALJ first considered Plaintiff's treatment records from the Logan Street Medical Group from October 18, 2012 through April 8, 2016 which showed longitudinal treatment for bilateral heel pain, respiratory difficulties, mixed hyperlipidemia and other medical conditions. (AR 22, 368-415, 491-524.) these records show the following.

On October 18, 2012, Plaintiff had a post-operative visit with Dr. Hann and complained of a tender mass at the mid portion of a healed incision over her left long finger. (AR 368.) She was scheduled for possible foreign body granuloma removal. (AR 368.)

On January 21, 2014, Plaintiff was seen to obtain lab results. (AR 372.) There is no record of a physical examination on this date.

Plaintiff was seen on January 29, 2015, complaining of bilateral foot pain. (AR 375.) There is no record of a physical examination, but she was diagnosed with mixed hyperlipidemia and bilateral foot pain. (AR 376.)

Plaintiff was seen on March 4, 2015, for a follow up. (AR 383.) There is no physical examination recorded and Plaintiff's diagnosis remained the same. (AR 384.)

On April 1, 2015, Plaintiff was seen for a follow up on her foot pain. (AR 387.) She reported that the prednisone did help and she was taking Gabapentin once a day. (AR 387.)

Plaintiff had an unremarkable examination with benign findings noted.  (AR 388.)  She was maintained on her current medications and was encouraged to use Gabapentin as directed.  (AR 389.)

On November 11, 2015, Plaintiff had a normal mammogram.  (AR 400.)

Plaintiff was seen on March 31, 2016 for lab results and was complaining of body pain.  (AR 404.)  Examination was unremarkable and Plaintiff was diagnosed with myalgia.  (AR 405.)  She was to continue ibuprofen.  (AR 406.)

Plaintiff returned on October 21, 2016 for lab results for her hyperlipidemia.  (AR 396.)  There are no physical examination findings.  (AR 397.)  She was diagnosed with mixed hyperlipidemia.  (AR 398.)

On May 1, 2017, Plaintiff was seen for a cough with post nasal drip and wheezing.  (AR 511.)  Other than diffuse expiratory wheezes, physical examination was unremarkable.  (AR 512.)  She was diagnosed with acute bronchospasm and prescribed prednisone and an inhaler.  (AR 512-513.)

On April 10, 2017, Plaintiff was seen for a follow upon her cholesterol.  (AR 515.)  There is no record of a physical examination.  (AR 516.)

Plaintiff was seen on May 8, 2017, with a cough and sore throat.  (AR 508.)  Other than nasal erythema, physical examination was unremarkable.  (AR 509.)  She was prescribed cipro for infection and promethazine for cough.  (AR 510.)

On May 22, 2017, Plaintiff was seen for a cough and a headache that had started about a week before.  (AR 504.)  Plaintiff's physical examination was generally unremarkable.  (AR 505.)  Mental status examination shows she was alert, oriented, named three objects, serial 7's, spells words backwards and has normal recall.  (AR 505.)  Gait had no ataxia or unsteadiness.  (AR 505.)  Cranial nerves were intact, and she had normal motor bulk and tone.  (AR 505.)  She was diagnosed with a headache and a cough and was to take cipro.  (AR 506.)

Plaintiff was seen on June 13, 2017, complaining of a cough and sore throat.  (AR 500.)  Plaintiff had a chest x-ray that showed slightly under expanded lungs but an otherwise normal x-ray of the chest.  (AR 498.)  Examination was generally unremarkable other than some nasal

erythema and hypertrophy. (AR 501.) She was diagnosed with allergic rhinitis and a cough. (AR 502.) She was advised to eat early and take a walk after dinner. (AR 502.)

On June 20, 2017, Plaintiff was seen for a follow up of her chest x-ray. (AR 494.) Physical examination was unremarkable. (AR 495.) She was diagnosed with a cough and dysphonia. (AR 496.)

The ALJ considered that concurrently, Plaintiff was being seen by Dr. Guzzetta, an addiction medication specialist. (AR 22.) Plaintiff was being evaluated and treated for depression, anxiety, insomnia, and opioid dependence. (AR 22, 326-367, 651-669.) These records show the following.

Plaintiff was seen for a follow up on her depression on July 12, 2013. (AR 326.) She reported that increasing her Lexapro had helped and she was sleeping better and was attending meetings five times a week. (AR 326.) Plaintiff was alert and oriented and in no acute distress. (AR 327.) Her gait had no ataxia or unsteadiness and she had normal motor bulk and tone. (AR 327.) Mood was anxious and depressed and affect was anxious and blunted. (AR 327.) Plaintiff was well-groomed and made good eye contact. (AR 327.) She was to continue Lexapro and Abilify was prescribed. (AR 328.)

Plaintiff returned on July 26, 2013, and reported that her medications were working, but she was having a bad headache. (AR 329.) She was attending five meetings per week. (AR 329.) She was alert, oriented and in no acute distress. (AR 329-330.) There were no tics and psychomotor activity was normal. (AR 330.) Plaintiff was depressed and anxious with a blunted and anxious affect. (AR 330.) She was well-groomed and made good eye contact. (AR 330.) Plaintiff was to continue the Lexapro and decrease the Abilify. (AR 330.)

On August 21, 2013, Plaintiff stated that her depression was improving and the Abilify was working. (AR 332.) Examination findings remain the same and she was to continue her medication. (AR 333.)

On October 2, 2013, Plaintiff reported that her depression was improving and she was able to tolerate the Abilify which was helping to decrease her depression. (AR 335.) She reported muscle aches which she felt was due to the Abilify. (AR 335.) Examination results

remained the same, the Abilify was decreased by half and Plaintiff was to begin Elavil. (AR 336.)

On October 30, 2013, Plaintiff reported that her symptoms were alleviated by the medication and she was feeling well. She was sleeping twelve hours a day as a side effect of amitriptyline and was attending five meetings a week. (AR 338.) Physical examination was unchanged and the Elavil was decreased. (AR 339.)

On December 18, 2013, Plaintiff reported that her medication was alleviating her symptoms, however, she was feeling worse since she had to go to court. (AR 341.) She was attending meetings five days a week. (AR 341.) Physical examination remained the same and she was to restart Neurontin. (AR 342.)

On December 23, 2013, Plaintiff reported that she was taking three Neurontin a day and was feeling much better. (AR 344.) She was attending five meetings per week. (AR 344.) Physical examination was unchanged. (AR 345.)

Plaintiff was next seen on June 1, 2015, requesting to be placed back on her medication. (AR 347.) She had been to prison and now had an ankle monitor. (AR 347.) She was attending two meetings per week. (AR 347.) Physical examination was unchanged. (AR 348.) Plaintiff was to continue Neurontin. (AR 348.)

On June 22, 2015, Plaintiff reported that the mediation was working well and was helping. (AR 350.) She was sleeping better, had less anxiety and depression and was attending two meetings a week. (AR 350.) Physical examination was unchanged and she was to continue her medication. (AR 351.)

On August 3, 2015, Plaintiff reported that everything was well and overall she felt great. (AR 353.) Plaintiff reported that she felt really good, the best she has in three years. (AR 353.) She denied anxiety or depression. (AR 353.) She was attending two meetings per week. (AR 353.) Physical examination was unchanged. (AR 354.) She was to continue her medication and consider neurofeedback. (AR 354.)

On October 7, 2015, Plaintiff reported that she was feeling really good. (AR 356.) She was stable and improving. (AR 356.) She had some anxiety and wanted to try getting off her

meds and using neurofeedback.  (AR 357.)  She was attending two meetings per week.  (AR 358.)  Physical examination was unchanged.  (AR 358.)  She was to continue the Neurontin as needed.  (AR 358.)

On December 7, 2015, Plaintiff reported that her symptoms were improving and stable.  (AR 359.)  She reported that she felt really good, but was unable to afford neurofeedback.  (AR 359.)  She was on probation until August and was attending two meetings per week.  (AR 359.)  Examination was unchanged and she was to continue Neurontin and Lexapro and increase meetings to four a week.  (AR 360-361.)

Plaintiff returned on March 9, 2016, reported that she wanted to get back on her anxiety medication.  (AR 362.)  Her depression was doing well and she was a little concerned due to multiple joint and low back pain.  (AR 362.)  Physical examination found Plaintiff to be oriented.  (AR 363.)  There were no tics and psychomotor activity was normal.  (AR 363.)  Mood was depressed and anxious with anxious and blunted affect.  (AR 363.)  Plaintiff was well groomed with good eye contact.  (AR 363.)  Speech was normal with no aphasia.  (AR 363.)  Speech was normal in quality, quantity, rate and Plaintiff was unimpaired in reading, writing, and thought.  (AR 363.)  Overall Plaintiff had normal form and content.  (AR 363.)  Immediate, recent, and remote memory were intact, and Plaintiff had normal concentration and intelligence.  (AR 363.)  Insight and judgment were intact.  (AR 363.)  Plaintiff was to continue her medication and increase her meetings to three per week.  (AR 363.)

Plaintiff reported on March 6, 2018 that her gabapentin was working well and she was no longer seeing Dr. Chann.  (AR 664.)  Plaintiff was alert and oriented and in no acute distress.  (AR 665.)  There were no tics and psychomotor activity was normal.  (AR 665.)  Mood was anxious.  (AR 665.)  Plaintiff was well groomed and made good eye contact.  (AR 665.)  Speech was normal in quality, quantity and rate with no aphasia.  (AR 665.)  Thought was normal in form and content.  (AR 665.)  Plaintiff had normal concentration and intelligence.  (AR 665.)  Insight and judgment were intact.  (AR 665.)  Plaintiff was to continue her gabapentin as needed and begin sertraline.  (AR 666.)

Plaintiff was seen on June 6, 2018, complaining of a lot of pain due to her fibromyalgia

and reported that the gabapentin was working well. (AR 658.) Plaintiff was alert and oriented and in no acute distress. (AR 659.) There were no tics and psychomotor activity was normal. (AR 659.) Plaintiff was well groomed and made good eye contact. (AR 659.) Speech was normal in quality, quantity and rate with no aphasia. (AR 659.) Thought was normal in form and content. (AR 659.) Plaintiff had normal concentration and intelligence. (AR 659.) Judgment and insight were intact. (AR 659.) Plaintiff was to increase her Seroquel, begin Cymbalta and continue Gabapentin and sertraline. (AR 660.)

Plaintiff was seen on September 10, 2018, for a medication follow up and complained of pain and that she was not receiving relief from her medications. (AR 652.) Plaintiff was alert and oriented and in no acute distress. (AR 653.) There were no tics and psychomotor activity was normal. (AR 653.) Plaintiff's mood was anxious and affect was normal. (AR 653.) Plaintiff was well groomed and made good eye contact. (AR 653.) Speech was normal in quality, quantity and rate with no aphasia. (AR 653.) Thought form and content were normal. (AR 653.) Concentration and intelligence were normal. (AR 653.) Judgment and insight were intact. (AR 654.) Plaintiff was to continue her medication. (AR 654.)

The ALJ also considered that records of Plaintiff's gynecologist, Dr. Maly and that she was treated for pelvic pain and chronic body aches. (AR 22, 420-426, 596-604.) The records show the following.

On February 18, 2016, Plaintiff was seen with complaints of vaginal and pelvic pressure for several days and shoulder pain which she was treating with Motrin. (AR 420.) She had an unremarkable exam and was to continue using Motrin for pain. (AR 420.)

On March 2, 2016, Plaintiff came for a follow up and complained of chronic pain through her muscle joints that effect different areas at different times. (AR 421.) She stated that the Motrin had not helped mush and she was having a problem with heartburn. (AR 421.) Her primary care physician had prescribed Gabapentin for her painful feet and it had helped. (AR 421.) Her pelvic pain was much less. (AR 421.) Plaintiff was prescribed Prilosec and antacids and was to go off the Motrin for a trial. (AR 421.)

Plaintiff returned on March 10, 2016 for a follow up. (AR 422.) She stated that she

received relief from her aching joints and muscles with Motrin and her acid stomach symptoms had been totally relieved with chewable antacids. (AR 422.) Plaintiff was referred to Dr. Barry. (AR 422.)

Plaintiff saw Dr. Maly on April 5, 2016. (AR 23, 596-597.) Pelvic examination was largely unremarkable, and she was prescribed an estrogen steroid hormone cream. (AR 597.)

Plaintiff had a pelvic ultrasound on July 7, 2016, which showed a tiny cystic area near a prior cesarean section scar that might be related to the scar or may be due to adenomyosis and ovaries were within normal limits. (AR 424.)

On August 23, 2016, Plaintiff was seen reporting increasing problems with her bladder. (AR 23, 604.) She reported that she has frequency, but drinks a lot and has increased urinary urgency and a little stress urinary incontinence with no suprapubic pain or discomfort. (AR 604.) She found to have mild stress urinary incontinence, pelvic examination was largely unremarkable, and she was prescribed an estrogen steroid hormone cream. (AR 23, 604.)

Plaintiff was seen on October 4, 2016, and reported definite improvement in her incontinence, urgency, vaginal dryness and irritation. (AR 23, 603.) She was to continue her medications. (AR 603.)

On April 3, 2017, Plaintiff had an annual examination and reported she had done well on estradiol but recently had recurrent hot flashes. (AR 24, 601.) When she had used Premarin in the fall her vaginal dryness, irritation and urinary urgency markedly improved and she was having no bladder control problems, no suprapubic pressure, and no abdominal or pelvic pain. (AR 24, 601.) Examination was unremarkable and her Estradiol was increased on days when she had hot flashes and she was to use Premarin cream for urinary control and Analpram for hemorrhoids. (AR 24, 602.)

On November 9, 2017, Plaintiff was seen for hot flashes. (AR 600.) She reported that medication has helped and her hot flashes are almost gone. (AR 600.) She was to do her Kegel exercises daily and reported being better now that she is over her cold and cough. (AR 600.)

On January 23, 2018, Plaintiff complained of a four or five week history of abdominal bloating, loose stools and recurrent epigastric pain but no urinary tract symptoms. (AR 599.)

Her symptoms were found to be due to GI etiology. (AR 599.) The record notes that she does not have a primary care physician which is why she came to Dr. Maly for evaluation. (AR 599.)

On February 13, 2018, Plaintiff was seen for a follow up and reported that her epigastric and substernal pain and burning had markedly improved but she still had intermittent episodes of abdominal cramping with two to three loose bowel movements daily. (AR 598.) Plaintiff was referred to Dr. Ginn for a GI evaluation and colonoscopy. (AR 598.)

On April 5, 2018, Plaintiff was seen for her annual examination and reported that she was doing well other than some vaginal dryness and discomfort with intercourse and stress urinary incontinence. (AR 596.) Physical examination was unremarkable and she was do daily Kegel exercises and encouraged to exercise and lose weight. (AR 596-597.)

The ALJ considered that during this same time period, from March 21, 2016 to December 5, 2017, Plaintiff was seeing a rheumatologist, Dr. Barry for treatment of symptoms of pain, fatigue, sleep disturbances, and depression. (AR 22-23, 416-417, 431-446, 532-556.) These records show the following.

The ALJ found it notable that on March 21, 2016, Plaintiff saw Dr. Berry complaining of general aching involving the trunk and limbs over the past 6 years. (AR 23, 431.) She reported that her main problem was her shoulders but that most joints ached, she was not sleeping well, and was fatigued. (AR 431.) She reported neck pain and having been in two motor vehicle accidents. (AR 431.) She reported difficulty completing her household chores and was "judged a Steinbrocker2." (AR 431.) However, physical examination was unremarkable. (AR 23.) On examination she was not in obvious distress. (AR 431.) Examination was unremarkable with no inflammation and range of motion was good, other than some reduced lateral rotation in the cervical spine (AR 431.) There was no tenderness or significant joint deformity. (AR 431.) Her symptoms suggested fibromyalgia and she was to be treated with Gabapentin. (AR 23, 431.) Depression was reported as mild and not a major problem. (AR 23, 431.)

Plaintiff was seen on April 5, 2016, and reported that general aching persisted and Gabapentin was not helping. (AR 431.) Plaintiff reported not sleeping at night. (AR 431.) Her Gabapentin was stopped and she was prescribed Cymbalta. (AR 431.)

On April 8, 2016, Plaintiff had a bone scan that showed low bone mass (osteopenic). (AR 23, 416.)

On May 18, 2016, Plaintiff reported that she was not sleeping and fatigue remained a problem. (AR 417.) She was using Gabapentin for her foot pain and had taken the Cymbalta which helps but was not sufficient. (AR 417.) She reported that her function was not good and she did not have much social interaction. (AR 417.) Zolpidem was added at night and Dr. Barry strongly recommended a gym. (AR 417.)

On June 21, 2016, Plaintiff reported being better than the last visit. (AR 543.) She was getting 6 to 7 hours of fairly good sleep and was feeling more rested. (AR 543.) Her aching seems less and she was more outgoing and smiling. (AR 543.) There was no swelling, warmth, or tenderness in the hands or feet where she complains of pain. (AR 543.) Plaintiff had bilateral carpal tunnel surgery in 2013, and Tinel's was not present and there was no wasting. (AR 543.) Hand function was judged to be good. (AR 543.) There was no synovitis and her circulation was normal. (AR 543.) There was no swelling, warmth or tenderness associated with her foot pain. (AR 543.) She was advised about proper footwear. (AR 543.)

On July 19, 2016, Plaintiff complained of ongoing hand pain that burns. (AR 543.) Her carpal tunnel surgery helped. (AR 543.) Plaintiff seemed to have bilateral foot pain in the tarsal area. (AR 543.) She has very flat feet and inserts had been tried but led to increased discomfort. (AR 543.) She was advised that there is a break in period and stated she would try them again. (AR 543.) There was no objective arthritis in the appendicular joints. (AR 543.) Deep tendon reflexes in the biceps, triceps, and brachioradialis were normal. (AR 543.) There was no triggering. (AR 543.) Capillaries were normal. (AR 543.) Plaintiff asked for codeine, but he put a hold on this medication for two months. (AR 543.)

On August 31, 2016, Plaintiff reported not doing well with general aching, fatigue, poor sleep and depression. (AR 433.) Lyrica was added and she was to continue Cymbalta. (AR 433.)

On September 27, 2016, Plaintiff reported that she was much more depressed and her function at home was poor. (AR 23, 433.) She was not able to take care of her four year old

18

grandson.  (AR 433.)  She did not want to take medication.  (AR 23, 433.)  Dr. Barry noted that Plaintiff's depression seemed more than usually seen in fibromyalgia.  (AR 433.)  He recommended that she see a psychiatrist and she agreed.  (AR 23, 433.)

On November 16, 2016, Plaintiff complained of the same symptoms.  (AR 542.)  She reported fatigue, not sleeping well, generalized aching in the muscles and joints, paresthesias in the arms and legs and remains depressed.  (AR 542.)  Plaintiff reported that she had seen Dr. Chann who told her she did not have significant pain and he would not give her new medication.  (AR 542.)  She reported that her activity at home was poor and she was no longer taking care of her four year old grandson.  (AR 542.)  Plaintiff did not read the paper Dr. Barry had provided to her on fibromyalgia.  (AR 542.)  She was not exercising as recommended.  (AR 542.)  "She is passive, depressed and wants an easy solution for her problems and [Dr. Barry] discussed this with her.  Until she shows more insight she will not improve."  (AR 542.)  Plaintiff was to taper off Lyrica as she thought this was making her worse.  (AR 542.)

On December 6, 2016, Plaintiff reported that her symptoms were unchanged despite using medications and seeing several physicians.  (AR 541.)  She reported that she remains stressed, fatigued with poor sleep, general aching, and depression remains a problem.  (AR 541.)  Dr. Barry had a long discussion with Plaintiff about her fibromyalgia.  (AR 541.)  He noted that Plaintiff had not come to grips with this and has not accepted that she is an integral part of any treatment program.  (AR 541.)  She is deconditioned and he again emphasized that she must be more physically active.  (AR 541.)  He recommended a gym for physical and psychological reasons.  (AR 541.)  He emphasized that until she comes to grip with her need to participate in her program she will not improve.  (AR 541.)

On February 7, 2017, Plaintiff complained of general aching in her trunk and four limbs, feeling fatigued, depressed, and not sleeping well.  (AR 541.)  Plaintiff reported that her physical activity is "very poor" and at times she could hardly get up, her finances are poor, and there is marital discord.  (AR 541.)  She was considering moving out of her house.  (AR 541.)  Dr. Barry noted that Plaintiff had not shown any desire to participate in management of her fibromyalgia and he had little to offer without her cooperation.  (AR 541.)

On April 3, 2017, Plaintiff reported that her symptoms had remained unchanged over the past few years and she had fatigue, general aching, poor sleep, and remained depressed. (AR 24, 534.) Plaintiff reported that her activity was very poor and she spent most of her days at home "resting." (AR 24, 534.) She does go to her drug meetings and receives some support there, but she has no money and conflicts with her husband remain unchanged. (AR 534.) Dr. Barry noted that he would not change Plaintiff's medications unless she shows more insight into her fibromyalgia and depression she will not improve. (AR 534.) Dr. Barry opined that until Plaintiff assumes more control of her life's problems and more insight into her situation, this will remain unchanged. (AR 534.) Plaintiff was prescribed Cymbalta for symptom relief. (AR 24, 534.)

On May 22, 2017, Plaintiff reported that she had a headache for the past week but no neurological symptoms or vision changes. (AR 534.) She also reported that her stress level remains high. (AR 534.) She used ibuprofen one to two times a day and this is sufficient. (AR 534.) Plaintiff was not in obvious distress and there were no gross neurological signs. (AR 534.) Mentation and limb movement were normal. (AR 534.) Balance and coordination were normal. (AR 534.)

Plaintiff was seen on June 20, 2017, for a refill of ibuprofen. (AR 534.) Her account was in arrears and Dr. Barry noted that only emergency medication would be refilled until she corrected her account or gets a new physician. (AR 534.) Plaintiff was advised that ibuprofen was available over the counter. (AR 534.)

On August 29, 2017, Plaintiff reported that her symptoms persisted in the same fashion and she had generalized body pain, fatigue, depression, poor sleep and social activity remained poor. (AR 533.) She reported she does not want to get out of her house, see people including family, finances remain a problem, and she was experiencing marital discord. (AR 533.) Plaintiff was only taking Gabapentin and ibuprofen and reported it did not help. (AR 533.) Due to her addiction problems in the past, Dr. Barry would not add narcotic medications. (AR 533.) Plaintiff was provided with a prescription for Naproxen and was to stop ibuprofen. (AR 533.) Dr. Barry noted that he would no longer order any medication after this because Plaintiff showed

1  little insight into her problems and this had not changed during the time he had seen her. (AR

2  533.) Dr. Barry told Plaintiff that he was retiring in the next few months. (AR 533.)

3  The ALJ also consider that on September 15, 2016, Plaintiff saw Dr. Han due to

4  numbness and tingling in both hands. (AR 23.) Dr. Han noted that bilateral hands do not show

5  any obvious thenar and first dorsal interosseous muscle atrophies, the hands were not assuming

6  claw deformity. (AR 447.) Plaintiff had negative Wartenberg sign and Froment tests. (AR

7  447.) She had negative bilateral Adson and Roos signs. (AR 447.) There was no tenderness

8  over the upper medial arms and volar pronator forearm areas and no tenderness over the medial

9  and lateral epicondylar areas. (AR 447.) Plaintiff had no tenderness at the bilateral cubital

10  tunnels, but she did have a positive elbow flexion test and positive Tinel and Phalen sign across

11  the bilateral carpal tunnel. (AR 447.) Phalen and Durkan's maneuver elicited some burning

12  pain, radiating up to the volar forearm and upper lateral arm area. (AR 447.) There was no pain

13  over the Guyon's canal. (AR 447.) Plaintiff had no pain or tenderness over the bilateral first

14  dorsal compartment with negative Finkelstein test and no pain at the thumb basal joints with

15  negative grind test. (AR 447.) There was no pain over the bilateral scaphoid and lunate joint

16  area, but the Watson maneuver elicited pain and discomfort, although the test itself was negative.

17  (AR 447.) There was a negative left shuck test, but some pain; negative piano key test, but some

18  pain; and Plaintiff complained of pain along the left ECU tendon sheath, especially near the

19  insertion into the dorsal base of the fifth metacarpal. (AR 447.) The resisted left wrist extension

20  elicited increased pain and discomfort. (AR 447.) Plaintiff also complained of slight pain and

21  tenderness over the left and right ulnar fovea, but Dr. Han did not see any obvious swelling there.

22  (AR 447.) There was no pain or tenderness over the bilateral FCU tendon or at the hook of

23  hamate. (AR 447.) Plaintiff did have pain and tenderness over the left and right ring fingers first

24  annular pulley areas, and passive IP joint flexion did elicit triggering with pain. (AR 447.)

25  Otherwise, Plaintiff had grossly intact flexors, extensors, and intrinsic function. (AR 447.)

26  Plaintiff had electrodiagnostic testing on September 28, 2016, which was normal and

27  showed no evidence of carpal tunnel syndrome or other neuropathy. (AR 23, 479-480.)

28  The ALJ considered that Plaintiff saw Dr. Chann, a psychiatrist, from October 12, 2016,

through January 9, 2018, who addressed her symptoms of depression and anxiety. (AR 23, 455-465, 558-594.) These records show the following.

Plaintiff saw Dr. Chann on October 12, 2016, and Dr. Chann assessed her with a Global Assessment of Function ("GAF")[2] of 45-50.[3] (AR 462.) Plaintiff was noted to have passive suicidal ideation. (AR 462.)

Plaintiff was seen on November 9, 2016, and Dr. Chann assessed her GAF was 45-50. (AR 457.) She had no suicidal or homicidal ideation. (AR 457.) Plaintiff hygiene was appropriate and her attire was casual. (AR 461.) She had appropriate eye contact and activity was average. (AR 461.) Speech was spontaneous and Plaintiff was cooperative. (AR 461.) Her mood was sad and dysphoric. (AR 461.) Plaintiff denied hallucinations, illusions, and delusions. (AR 461.) Her thought content was worthless. (AR 461.) Though processes were goal directed. (AR 461.) Plaintiff's attention and concentration were fair and distractibility was variable. (AR 461.) Insight was intact (AR 461. )

Dr. Chann saw Plaintiff on December 21, 2016, reporting that she was taking her medication and was sleeping more but still tired. (AR 455.) She stated that her sister visits with her two to three times a week. (AR 455.) Plaintiff presented with appropriate hygiene and casual attire. (AR 456.) Her eye contact was appropriate. (AR 456.) Activity was average, speech was spontaneous, and Plaintiff was cooperative. (AR 456.) Her mood was sad, fearful, anxious, and dysphoric. (AR 456.) Plaintiff denied hallucinations, illusions, or delusions. (AR 456.) Her thought content was helpless, worthless, and guilt. (AR 456.) Attention and concentration were fair. (AR 456.) Distractibility was variable. (AR 456.) Plaintiff was oriented and IQ was average. (AR 456.) Insight and judgment were superficial (AR 456.)

---

[2] "The GAF score is a 'multiaxial' assessment that reflects a clinician's subjective judgment of a patient's overall level of functioning." Green v. Astrue, No. 5:10-cv-01294-AJW, 2011 WL 2785741, at *2 n.2 (C.D. Cal. July 15, 2011) (quoting American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders Multiaxial Assessment 30, 34 (4th ed. Text rev. 2000) (DSM-IV)).

[3] A GAF range of 41–50 reflects "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." Vanbibber v. Carolyn, No. C13-546-RAJ, 2014 WL 29665, at *1 (W.D. Wash. Jan. 3, 2014) (quoting American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders Multiaxial Assessment 30, 32 (4th ed. Text rev. 2000) (DSM-IV)).

Plaintiff was seen on March 30, 2017, with appropriate hygiene and casual attire. (AR 24, 591.) Eye contact was appropriate and speech was spontaneous. (AR 591.) Plaintiff was cooperative. (AR 591.) Mood was sad and discouraged. (AR 24, 591.) There were no hallucinations or delusions. (AR 591.) Thought content was guilt and evasive. (AR 591.) Attention and concentration were fair and distractibility was variable. (AR 591.) Plaintiff was oriented and insight and judgment were intact. (AR 591.) Her GAF was assessed at 45-50. (AR 592.)

Plaintiff was seen on April 27, 2017, complaining regarding her spouse and reported that her sister had got her into coloring in coloring books. (AR 585.) Hygiene was appropriate and attire causal. (AR 586.) Speech was spontaneous and there were no hallucinations or delusions. (AR 586.) Thought content was helplessness and thought process was goal directed. (AR 586.) Attention and concentration were fair. (AR 586.) Distractibility was variable and Plaintiff was oriented. (AR 586.) Plaintiff was assessed with a GAF of 45-50. (AR 587.)

On June 8, 2017, Plaintiff's hygiene appropriate. (AR 580.) Eye contact was appropriate and activity was average. (AR 580.) Plaintiff's speech was spontaneous and she was cooperative. (AR 580.) Her mood was stable. (AR 580.) There were no hallucinations or illusions. (AR 580.) Thought content was excess worry. (AR 580.) Thought processes were goal directed. (AR 580.) Attention and concentration were fair and distractibility was variable. (AR 580.) Plaintiff was oriented and insight and judgment were intact. (AR 580.) Plaintiff was assessed with a GAF of 45-50. (AR 581.)

Plaintiff was seen on September 5, 2017, and mental examination was largely unremarkable. (AR 24, 573.) Hygiene was appropriate and attire was casual. (AR 574.) Plaintiff had appropriate eye contact. (AR 574.) Activity was average, and she is noted to be jittery. (AR 574.) Speech was spontaneous and Plaintiff was cooperative. (AR 574.) Her mood was irritable. (AR 24, 574.) Plaintiff had no hallucinations or illusions. (AR 574.) Thought process was evasive. (AR 574.) Attention and concentration were fair. (AR 574.) Plaintiff was oriented and insight and judgment were intact. (AR 574.)

On October 10, 2017, Dr. Chann saw Plaintiff and mental examination was largely

unremarkable.  (AR 24, 569.)  Plaintiff was seen with appropriate hygiene  and casual attire.  (AR 569.)  Eye contract was appropriate.  (AR 569.)  She had no hallucinations or illusions, and thought content was worthless.  (AR 569.)  Attention and concentration was fair.  (AR 569.)  Distractibility was variable.  (AR 569.)  Plaintiff was oriented and insight and judgment were superficial.  (AR 569.)

Plaintiff was seen on November 9, 2017 with appropriate hygiene and casual attire.  (AR 564.)  Eye contact was appropriate and there were no hallucinations or illusions.  (AR 564.)  Plaintiff reported that she was able to leave the house.  (AR 564.)  Attention and concentration were fair and distractibility was variable.  (AR 564.)  Insight and judgment were superficial.  (AR 564.)  She had no suicidal or homicidal ideation.  (AR 564.)

Plaintiff was seen on January 9, 2018, and mental examination was largely unremarkable.  (AR 24, 558.)  She reported that she had went out for the holidays.  (AR 558.)  Hygiene was appropriate and attire was casual.  (AR 559.)  Plaintiff had appropriate eye contact and activity was average.  (AR 559.)  Her speech was spontaneous and she was cooperative.  (AR 559.)  Plaintiff denied hallucinations or illusions.  (AR 559.)  Thought content was evasive and she ruminated.  (AR 559.)  Attention and concentration were fair.  (AR 559.)  Plaintiff was oriented and insight and judgment were intact.  (AR 559.)  Plaintiff was assessed with a GAF of 45-50.  (AR 560.)

The ALJ also considered that Plaintiff saw Dr. Aryan, a neurosurgeon, to assess her complaints of neck pain with upper extremity numbness.  (AR 23, 24, 526-528.)  Dr. Aryan evaluated Plaintiff on June 29, 2017, to see if anything could be done from a surgical standpoint.  (AR 526.)  Physical and mental examination were normal.  (AR 24.)  Dr. Aryan found Plaintiff to be well developed and well nourished and that she appeared her stated age.  (AR 528.)  Plaintiff was awake, oriented to time, place, and person.  (AR 528.)  She had a normal mood and affect.  (AR 528.)  Musculoskeletal examination notes 5/5 strength for deltoids, biceps, triceps, and hand grip on motor exam with no atrophy noted.  (AR 528.)  Plaintiff was able to ambulate without assistance.  (AR 528.)  Sensory examination revealed no areas of diminished perception to pinprick or soft touch in the upper extremities.  (AR 528.)  Examination of the peripheral

vessels and lymphatics showed no swelling or tenderness present, and there was no lymphadenopathy present in cervical regions. (AR 528.) Plaintiff was diagnosed with spinal stenosis, cervical region and was referred for physical therapy and injections. (AR 24, 529.)

2.      ALJ's Consideration of Opinion Evidence

The ALJ went on to consider the opinion evidence that was germane to the period from June 20, 2013 through December 31, 2017. (AR 24-27.) Plaintiff had a consultative psychiatric evaluation on June 27, 2017 by Dr. Lewis. (AR 24-25, 470-474.) Plaintiff endorsed symptoms of depression and anxiety with medical comorbidities. (AR 24, 470.) Plaintiff reported that she still gets a little sad because she embezzled $200,000 and has to pay it back. (AR 471.) She reported a history of polysubstance abuse and is going to group therapy and a psychiatrist and does not get suicidal when she is depressed. (AR 24, 471.) Hygiene was good and she was appropriately dressed. (AR 472.) There were no involuntary movements or unusual mannerisms. (AR 472.) Eye contact was good and facial expressions were appropriate. (AR 472.) Behavior was cooperative. (AR 472.)

Plaintiff's mental status examination was normal. (AR 24.) Conversation, pace, and intensity were easily understood with no obvious expressive or receptive deficits. (AR 472.) Form of speech was logical, coherent, and concise; articulation quality was clear; velocity and volume were normal. (AR 472.) Stream of mental activity was within normal limits. (AR 472.) Stream of consciousness was linear, logical, coherent, and goal directed. (AR 472.) There were no indications of hallucinations or delusions. (AR 472.) Plaintiff was guarded while discussing her allegations. (AR 472.) Affect was appropriate. (AR 472.) Plaintiff reported her sleeping and eating habits as good and denied a history of suicide attempts, self-injurious behavior and psychiatric admission. (AR 472.)

Plaintiff was oriented to person, place and date. (AR 472.) Her fund of knowledge and information was consistent with her educational level and socioeconomic/cultural background. (AR 472.) There was no difficulty identifying the capital and governor of California, naming three former presidents of the United States, naming the current president, stating 12 eggs in a dozen, and the reason why food is put in the refrigerator. (AR 472.) She was able to

differentiate appropriately.  (AR 472.)

Plaintiff's judgment was within normal limits.  (AR 472.)  She performed satisfactorily on gross indicator of rote learning and memory, attention encoding and auditory processing.  (AR 473.)  She performed satisfactorily on broad indicator of numerical reasoning ability and mental alertness.  (AR 473.)  Recent memory recall was satisfactory.  (AR 473.)  Attention and concentration were satisfactory.  (AR 473.)  Abstract thinking was within normal limits.  (AR 473.)

Plaintiff reported her daily activities as getting up, drinking coffee, and taking her medication.  (AR 473.)  She reported she washes the dishes, does the cooking and sweeping.  (AR 473.)  Her husband does the laundry, pays the bills and does the grocery shopping.  (AR 473.)  She reports her hobby to be watching television.  (AR 473.)

Dr. Lewis diagnosed Plaintiff with unspecified depressive disorder, mild in partial remission; unspecified anxiety disorder; nicotine dependence in reported remission; and opioid dependence in reported remission.  (AR 24, 473-474.)  Her prognosis for improving in the next 12 months was good.  (AR 474.)

Dr. Lewis opined that Plaintiff was not significantly impaired from a mental status standpoint.  (AR 24.)  Specifically, Dr. Lewis found Plaintiff was capable of managing her own funds; her ability to perform simple and repetitive tasks is unimpaired.  (AR 474.)  Her ability to perform detailed and complex tasks, to accept instructions from supervisors, and to interact with coworkers and the public to perform work activities on a consistent basis without special or additional instruction is unimpaired.  (AR 474.)  Plaintiff's ability to maintain regular attendance in the workplace and complete a normal workday/workweek without interruptions from a psychiatric condition and to deal with the usual stress encountered in the workplace are mildly impaired.  (AR 474.)

The ALJ considered the mental residual functional capacity questionnaire completed on April 17, 2017 by Dr. Chann, Plaintiff's treating psychiatrist.  (AR 25, 483-485.)  Dr. Chann did not indicate the frequency or length of contact.  (AR 483.)  She diagnosed Plaintiff with "dysterymia;" major depression moderate to severe; PTSD; psychological functions impacting

physical health; relational issues with husband; and financial problems; and fibromyalgia; pain syndrome; and overweight. (AR 25, 483.) Plaintiff's prognosis was guarded. (AR 483.) Plaintiff was taking Cymbalta, Elavil, and Gabapentin. (AR 483.) Side effects of Plaintiff's medications were listed as lack of energy, tiredness, and drowsiness. (AR 483.)

Dr. Chann opined that Plaintiff was unable to remember locations and work-like procedures; understand and remember very short and simple instructions; understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods of time; perform activities within a schedule; maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms; and perform work at a consistent pace without an unreasonable number and length of rest periods for 15 percent of a workday. (AR 25, 483.) She opined Plaintiff was unable to carry out very short and simple instruction for five percent of a workday and unable to make simple work related decisions for 10 percent of a workday. (AR 483-484.) Plaintiff was unable to accept instruction and respond appropriately to criticism from supervisors 15 percent of the workday. (AR 25, 484.) She would be unable to get along with coworkers and peers without distracting them or exhibiting behavioral extremes and maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness ten percent of the day. (AR 484.) She would be unable to interact appropriately with the general public and ask simple questions or request assistance five percent of the day. (AR 484.) Plaintiff would be unable to be aware of normal hazards and take appropriate precautions and to travel in unfamiliar places or use public transportation 10 percent of the day. (AR 484.) She would be unable to respond appropriately to changes in the work setting and set realistic goals or make plans independently of others fifteen percent of the day. (AR 25, 484.)

Dr. Chann stated that Plaintiff presented with moderately severe depression symptoms which consisted of difficulty getting out of bed, taking care of activities of daily living, increased aches and pains in body, feeling tired, difficulties sleeping, lack of concentration, forgetfulness,

headaches, guilt, anxiety related to personal health and financial issues, fears, irritability, self-punitive, and internal anger. (AR 485.) Dr. Chann opined that Plaintiff would be absent from work 2- 3 days per month. (AR 485.) She stated that Plaintiff presents being forgetful, with inability to concentrate, and her mind feels scattered. (AR 484.) Dr. Chann found that Plaintiff was not a malinger. (AR 485.) Dr. Chann based her opinion on Plaintiff's history and medical file, the progress, and office notes, and psychological evaluations and reports. (AR 485.) Dr. Chann stated, Plaintiff presents being very depressed, has physical pain impacting psychological health, has been compliant and motivated with treatment, and is going through medication adjustment but so far has had minimal response. (AR 485.)

The ALJ considered the May 3, 2017,[4] physical medical source statement provided by Plaintiff's treating rheumatologist, Dr. Barry. (AR 25, 487-490.) Dr. Barry stated that he had seen Plaintiff every 2-3 months since March of 2016. (AR 487.) The diagnosis upon which the opinion was based was fibromyalgia. (AR 25, 487.) Plaintiff's prognosis was guarded. (AR 487.) Her symptoms were fatigue, pain, and depression. (AR 487.) There were no objective signs or clinical findings to support the opinion. (AR 487.) Plaintiff had been treated with analgesics and antidepressants. (AR 487.) Her impairments were expected to last 12 months and emotional factors contribute to the severity of her symptoms and limitations. (AR 487.)

Dr. Barry opined that Plaintiff can walk one block without severe pain; sit for thirty minutes at one time; stand ten minutes at one time; and can sit for about four hours and stand/walk about two hours in an eight hour workday. (AR 25, 487.) Plaintiff would need to walk five times for ten minutes during an eight hour workday. (AR 488.) Plaintiff does not need to elevate her legs when sitting. (AR 488.) She does not need an assistive device. (AR 488.) Plaintiff can lift less than 10 pounds frequently, 10 pounds occasionally, and 20 pounds rarely. (AR 488.) She can occasionally twist, stoop/bend, crouch/squat, climb stairs, and never climb ladders. (AR 488.) She has no reaching, fingering, or handling limitations. (AR 489.)

Dr. Barry opined that Plaintiff would be off task 25 percent or more of a workday due to

---

[4] The ALJ stated the date of this as May 31, 2017, however, the date of the opinion is May 3, 2017.

symptoms severe enough to interfere with concentration and attention. (AR 25, 489.) She is capable of low stress work. (AR 489.) She would have good days and bad days and would miss about four days a month due to impairments or treatment. (AR 489.) This is consistent with typical fibromyalgia symptoms. (AR 489.) Plaintiff's depression results in poor tolerability to stress. (AR 489.) Plaintiff would need to take one to two unscheduled breaks in a workday. (AR 490.) The onset of these limitations is 2010. (AR 490.)

The ALJ also considered a September 10, 2018 physical medical source statement by addiction medicine specialist, Dr. Guzzetta. (AR 25, 638-641.) He diagnosed Plaintiff with fibromyalgia and anxiety and stated her prognosis was fair. (AR 25, 638.) Her symptoms included pain and anxiety. (AR 638.) There were no clinical findings or objective signs. (AR 638.) He characterized her pain as total body, moderately severe. (AR 638.) Plaintiff had been treated with Gabapentin with inadequate response. (AR 638.) He found that emotional factors did not contribute, but her anxiety did contribute, to her symptoms and functional limitations. (AR 638.) Dr. Guzzetta identified 12 trigger points. (AR 638.) Dr. Guzzetta opined that Plaintiff could lift and/or carry up to 10 pounds occasionally. (AR 25, 638.) He indicated that Plaintiff could stand and/or walk for less than two hours in an eight-hour workday, as well as sit for less than two hours in an eight-hour workday, with significant postural limitations. (AR 25, 638-639.) Dr. Guzzetta opined that Plaintiff would likely be "off task" for 25% or more of an eight-hour workday due to symptoms that would interfere with attention and concentration. (AR 25, 639.) He opined that Plaintiff was capable of moderate stress, normal work. (AR 640.) She would be likely to have good and bad days. (AR 640.) Dr. Guzzetta opined that Plaintiff would be expected to be absent from work more than four days per month. (AR 25, 641.) These limitations would apply since 2012. (AR 640.)

The ALJ also considered a September 24, 2018 opinion by FNP Bergen and a October 20, 2018 mental medical source statement by psychiatrist Sievert finding them to be inconsistent with the medical record prior to the date last insured. (AR 26, 642-646, 648-650.) FNP Bergen stated she had been seeing Plaintiff since March 14, 2018. (AR 642.) Plaintiff was diagnosed with fibromyalgia and her prognosis was fair. (AR 642.) Plaintiff's symptoms were pain and

anxiety due to disease state.  (AR 642.)  Plaintiff's pain was described as total body, moderately severe.  (AR 642.)  When asked to identify clinical findings and objective signs, FNP Bergen wrote not applicable.  (AR 642.)  The treatment and response was listed as Gabapentin with inadequate response.  (AR 642.)  Emotional factors do not contribute, but anxiety and psychological factors due contribute to the severity of the symptoms and functional limitations.  (AR 642.)  FNP Bergen identified 12 trigger points.  (AR 643.)  She opined that Plaintiff could sit or stand for 20 minutes at one time.  (AR 644.)  Plaintiff can sit and stand/walk for less than two hours in an eight hour workday.  (AR 644.)  Plaintiff does not need to shift at will from standing, sitting, and walking.  (AR 644.)  Plaintiff must walk for ten minutes every twenty minutes and would need to have a 10 minute unscheduled break every 20 minutes due to pain, paresthesias, and numbness.  (AR 644.)  Plaintiff does not need to elevate her legs with prolonged sitting and does not need an assistive device when standing or walking.  (AR 644.)  Plaintiff can occasionally lift 10 pounds.  (AR 645.)  She can frequently twist and climb stairs, occasionally stoop and bend; and rarely crouch or squat.  (AR 645.)  Plaintiff has no reaching, fingering or handling limitations.  (AR 645.)  Plaintiff is likely to be off task more than twenty five percent of the day due to symptoms severe enough to interfere with her attention and concentration.  (AR 645.)  She is capable of moderate stress, normal work.  (AR 645.)  She is likely to have good and bad days.  (AR 645.)  Plaintiff will miss more than four days per month due to her impairments or treatment.  (AR 645.)  The earliest that the limitations would apply would be March 14, 2018, which is after the date last insured.  (AR 646.)

Dr. Sievert had seen Plaintiff on one occasion.  (AR 648.)  He diagnosed her with major depression, severe, recurrent.  (AR 648.)  Her prognosis was fair.  (AR 648.)  Plaintiff had no limitation in her ability to remember locations and work-like procedures; and understand and remember very short and simple instructions.  (AR 648.)  She was precluded five percent of an 8 hour workday from understanding and remembering detailed instructions.  (AR 648.)  Her memory was generally intact.  (AR 648.)  Plaintiff was not limited in her ability to carry out very short and simple instructions or in making simple work related decisions.  (AR 648.)  She was precluded ten percent of the time from carrying out detailed instructions; maintaining attention

and concentration for extended periods of time; performing activities within a schedule, maintaining regular attendance, and be being punctual within customary tolerances; sustaining a routine without supervision; working in coordination with or in proximity to others without being distracted by them; and completing a normal workday and workweek without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods due to ongoing symptoms of depression.  (AR 648.)  Plaintiff has no limitations in her ability to ask simple questions or request assistance; and in maintaining socially appropriate behavior, and adhering to basic standards of neatness and cleanliness.  (AR 648.)  Plaintiff is precluded ten percent of the time from interacting appropriately with the general public; and accepting instructions and responding appropriately to critics from supervisors and is precluded fifteen percent of the time from getting along with coworkers or peers without distracting them or exhibiting behavioral extremes due to ongoing mental and physical problems.  (AR 648-649.) Plaintiff had no limitations in her ability to be aware of normal hazards and take normal precautions.  (AR 649.)  Plaintiff was precluded five percent of the time from responding appropriately to changes in the work setting and setting realistic goals or making plans independently of others; and was precluded fifteen percent of the time from traveling in unfamiliar places or using public transportation due to marked difficulty from ongoing depression.  (AR 649.)  Plaintiff would be absent more than four days per month due to her impairments or treatment.  (AR 649.)  The earliest the limitations would apply would be October 2018.  (AR 650.)

The ALJ also considered the opinion of the agency physicians who reviewed the medical record.  (AR 26.)  The ALJ found that Dr. Rehman opined on July 25, 2016, that Plaintiff could perform a full range of light work.  (AR 26.)  Dr. Rehman reviewed that record and found that Plaintiff could occasionally lift and carry 20 pounds and frequently lift and carry ten pounds.  (AR 115.)  Plaintiff could stand and walk or sit for 6 hours in a normal 8 hour workday with normal breaks.  (AR 115.)  Plaintiff had no postural or manipulative limitations.  (AR 115.)  The ALJ also found that Dr. Bugg reviewed the record on October 28, 2016, and also opined that Plaintiff could perform the full range of light work.  (AR 26, 128-129.)

1    Dr. Dees reviewed the record on July 21, 2016, and found that Plaintiff had only mild

2   limitations in her activities of daily living; ability to maintain concentration, persistence and pace

3   and no limitations in her ability to maintain social functioning.  (AR 26, 113.)  Dr. Dees noted

4   that Dr. Guzzetta's notes of March 9, 2016 showed that Plaintiff requested to be placed back on

5   medication, but she reported doing well with depression, was fully oriented, had no psychomotor

6   disturbance, normal mood and affect, normal speech, memory and concentration were intact, and

7   there was no sign of cognitive decline or impairment.  (AR 113.)  On reconsideration, Dr. Flocks

8   reviewed the record and on February 24, 2017 opined that Plaintiff had no restrictions or

9   difficulties in mental functioning.  (AR 26, 126.)

10   Plaintiff argues that the ALJ erred by failing to provide specific and legitimate reasons

11  for giving greater weight to the agency physicians than to the opinion of Dr. Guzzetta and Dr.

12  Barry.

13   1.   Dr. Guzzetta's Opinion

14   Plaintiff argues that the ALJ failed to take into account the fact the length of treatment by

15  Dr. Guzzetta.  A treating physician's opinion is entitled to controlling weight on the issue of the

16  nature and severity of the claimant's impairment where it is well-supported by medically

17  acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other

18  substantial evidence in the record.   20 C.F.R. § 404.1527(c)(2).   "If there is 'substantial

19  evidence' in the record contradicting the opinion of the treating physician, the opinion of the

20  treating physician is no longer entitled to 'controlling weight.' "  Orn v. Astrue, 495 F.3d 625,

21  632 (9th Cir. 2007) (citing 20 C.F.R. § 404.1527(d)(2).  "In that event, the ALJ is instructed by §

22  404.1527(d)(2) to consider the factors listed in § 404.1527(d)(2)-(6) in determining what weight

23  to accord the opinion of the treating physician."  Orn, 495 F.3d at 632.  The factors to be

24  considered include the " '[l]ength of the treatment relationship and the frequency of

25  examination' by the treating physician, the '[n]ature and extent of the treatment relationship'

26  between the patient and the treating physician, the '[s]upportability' of the physician's opinion

27  with medical evidence, and the consistency of the physician's opinion with the record as a

28  whole.' "   Ghanim v. Colvin, 763 F.3d 1154, 1161 (9th Cir. 2014) (quoting 20 C.F.R. §

404.1527(c)(2)-(6)).  "In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight."  Ghanim, 763 F.3d at 1161 (quoting Orn, 495 F.3d at 631).

The ALJ did consider that Plaintiff had been treated by Dr. Guzzetta, an addiction specialist, from September 12, 2013 through September 10, 2018.  (AR 22.)  The ALJ noted that Dr. Guzzetta had seen Plaintiff for evaluation and treatment of depression, anxiety, insomnia, and opioid dependence.  (AR 22.)  The ALJ considered the September 10, 2018 physical medical source statement provided by Dr. Guzzetta.  (AR 25.)  The ALJ found that the functional limitations opined by Dr. Guzzetta were mostly inconsistent with the relevant medical evidence in the record through the date last insured, including the reports of normal or largely normal physical examinations.  (AR 25.)  The ALJ found that the record as a whole tends to support a finding that Plaintiff could perform a wide range of light work and little weight was given to Dr. Guzzetta's opinion.  (AR 25.)

Plaintiff contends that the ALJ did not cite to evidence other than four pages of the medical record representing normal examinations, but Plaintiff fails to cite to any evidence with other than normal examinations findings that would contradict the ALJ's finding.  Defendant counters that the medical record is consistent with the opinions of the agency physicians that Plaintiff had the ability to perform light work and Dr. Guzzetta's treatment from the relevant period consisted of normal examination findings.  Defendant cites to multiple records in the exhibits cited by the ALJ that demonstrate that Plaintiff had a normal gait with no unsteadiness and normal muscle bulk and tone.  (AR 327 (July 12, 2013), 331 (July 26, 2013), 333 (August 21, 2013), 336 (October 2, 2013), 339 (October 30, 2013), 342 (December 18, 2013), 345 (December 23, 2013), 348 (June 1, 2015), 351 (June 22, 2015), 354 (August 3, 2015), 357 (October 7, 2015), 360 (December 7, 2015), 363 (March 9, 2016.)  The Court notes that many of the early records do not contain any physical findings and those that do show normal findings.

Similarly, Defendant argues that the other examinations by Plaintiff's medical providers in the record demonstrate similar generally normal findings.  (AR 431 (March 21, 2016), 447 (September 15, 2016), 528 (June 29, 2017), 534 (May 22, 2017), 536 (August 29, 2017), 542 (no

physical findings for visits on August 31, 2016; September 27, 2016; and November 16, 2016), 543 (June 21, 2016 and July 19, 2016).)  An x-ray of the neck only showed mild cervical spondylosis and an electromyography showed no signs of carpal tunnel.  (AR 451, 529.)

Substantial evidence in the record supports the ALJ's finding that Plaintiff had generally normal medical and psychological examinations which were inconsistent with the limitations opined by Dr. Guzzetta.  Plaintiff argues that the lack of objective findings are not inconsistent with Plaintiff's complaints of fibromyalgia, but the ALJ found that Plaintiff's fibromyalgia was a severe impairment.

Plaintiff argues that the ALJ erred by rejecting Dr. Guzzetta's opinion that Plaintiff would miss over four days of work per month due to her fibromyalgia pain and that her pain would interfere with her attention and concentration interfering with her perform even simple tasks for twenty five percent of the workday.  However, as the ALJ addressed in the opinion, the mental health records in evidence through the date last insured were inconsistent with such limitations in Plaintiff's attention and concentration.  (AR 25.)  Dr. Guzzetta's records show largely normal mental examinations, including that Plaintiff was in no acute distress, was alert and oriented to person, place and time; and had normal psychomotor activity.  (AR 328, 331, 333, 336, 339, 342, 345, 346, 351, 354, 357, 360.)  These records also show that Plaintiff reported improvement with her medication and that her symptoms were alleviated by her medication.  (AR 332, 335, 338, 341, 344.)  When Plaintiff returned in June 2015 after being released from prison, she stated she had been totally depressed and wanted to get back on her anxiety and depression medication.  (AR 346.)  At the next visit, she reported that everything was well and overall she felt great, the best she had felt in three years.  (AR 353.)  She continued to report that her medication was working, she was improving and her symptoms were alleviated by the medication.  (AR 350.)  In September and October of 2015, Plaintiff reported that her symptoms were not limiting her activities, she was continuing to feel well, and wanted to get off medications and try biofeedback.  (AR 356, 359.)

Plaintiff returned on March 9, 2016, stating she wanted to get back on her medication and was doing well with her depression and anxiety, but having pain in multiple joints and her lower

back.  (AR 362.)  Mental status examination was normal: including unimpaired reading, writing and thought; intact cognition and memory; and normal concentration and intelligence.  (AR 363.)  Her judgment and insight were intact.  (AR 363.)

Dr. Guzzetta saw Plaintiff on March 6, 2018.  (AR 664.)  Mental examination was unremarkable with normal concentration and intelligence, and intact judgment and insight.  (AR 665.)  Plaintiff returned on June 6, 2018, and September 10, 2018, and at both visits mental status findings remained the same.  (AR 653-654, 659.)  On September 10, 2018, Dr. Guzzetta issued the physical medical source statement.  (AR 638-641.)  Inconsistencies in a physician's opinion and lack of support in the medical record constitutes a legitimate basis for rejecting the opinion.  Morgan v. Comm'r, 169 F.3d 595, 603 (9th Cir. 1999); Thomas, 278 F.3d at 957.

The ALJ could reasonably find that the limitations opined by Dr. Guzzetta were inconsistent with the medical record.  The ALJ provided a specific and legitimate reason for the weight provided to Dr. Guzzetta's opinion.

2.  Dr. Barry's Opinion

Plaintiff argues that the ALJ erred by failing to take into account that Dr. Barry specialized in rheumatology.  However, the ALJ did consider that Dr. Barry was a rheumatologist and Plaintiff saw him to address her symptoms of pain, fatigue, sleep disturbances, and depression.  (AR 22-23.)  The ALJ noted that rheumatologist Dr. Barry saw Plaintiff on March 21, 2016, reporting neck pain and general aching of the trunk and all four limbs.  (AR 23, 431.)  Physical examination was largely unremarkable, with no tenderness or significant joint deformity, although Dr. Barry did observe reduced range of motion in the cervical spine.  (AR 23, 431.)  Dr. Barry found that Plaintiff's symptoms were suggestive of fibromyalgia and depression was not felt to be a problem.  (AR 23, 431.)

The ALJ considered that Plaintiff saw Dr. Barry again on September 27, 2016 complaining that she was much more depressed and wanted to avoid medication.  (AR 23, 433.)  Dr. Barry directed Plaintiff to see a psychiatrist.  (AR 23, 433.)  Plaintiff saw Dr. Barry on April 3, 2017, and reported that her symptoms were unchanged and she spends most of her day at home.  (AR 24, 534.)  Dr. Barry prescribed Cymbalta for symptom relief.  (AR 24, 534.)

The ALJ also considered the May 3, 2017 physical source statement completed by Dr. Barry. (AR 25, 487-490.) The ALJ concurred that Plaintiff is limited to a range of light work, but found Dr. Barry's physical limitations to be otherwise inconsistent with the relevant medical evidence in the record through the date last insured including the normal or largely unremarkable physical examinations. (AR 25.) The ALJ afforded Dr. Barry's opinion some, but not significant, weight. (AR 25.)

Plaintiff argues that the ALJ's finding that Dr. Barry's opinion was inconsistent with the medical record is contrary to fact and law. However, Plaintiff does not point to any evidence in the record that would support Dr. Barry's opinion. Rather, Plaintiff argues that no such evidence is necessary and the visits records Plaintiff's symptom complaints. Defendant argues that the ALJ properly found that the medical record was more consistent with the opinions of the agency physicians that Plaintiff can perform light work. Defendant cites to the numerous records addressed above which show no acute distress, normal gait with no unsteadiness, and normal muscle bulk and tone. Defendant also argues that, although Dr. Barry treated Plaintiff on multiple occasions, his records often contain very few clinical findings. Defendant also notes that Dr. Barry's notes show that Plaintiff did not have any desire to participate in the management of her fibromyalgia and he could offer her little absent her cooperation.

Here, Plaintiff argues that the ALJ demonstrated a fundamental misunderstanding of fibromyalgia citing to Revels v. Berryhill, 874 F.3d 648, 663 (9th Cir. 2017). In Revels, the ALJ rejected the testimony of the claimant's physician finding that it was not supported by the objective medical evidence. Id. at 663. The appellate court found that the ALJ had erred by relying on four visits in which the doctor noted that the claimant's body parts were nontender with normal range of motion. Id. "Lacking certain tender points does not rule out fibromyalgia-related symptoms, since a doctor need only find eleven out of eighteen tender points to diagnose the condition. Moreover, a person with fibromyalgia may have 'muscle strength, sensory functions, and reflexes [that] are normal.' " Id. (citations omitted). The ALJ also erred by finding that the opinion was not supported by the objective medical evidence because at multiple appointments, the evidence showed less than eleven out of eighteen tender points which

demonstrated a fundamental lack of knowledge of fibromyalgia which is diagnosed "entirely on the basis of patients' reports of pain and other symptoms," and "there are no laboratory tests to confirm the diagnosis." Id. (citations omitted.) "Pursuant to SSR 12-2P, tender-point examinations themselves constitute 'objective medical evidence' of fibromyalgia" and "symptoms of fibromyalgia wax and wane," so a person may have "bad days and good days." Revels, 74 F.3d at 663.

Here, Dr. Barry's set forth physical limitations, some of which the ALJ found were consistent with light work. The ALJ accepted those limitations consistent with light work and rejected the more severe limitations finding that they were inconsistent with the medical record which demonstrated normal or unremarkable physical examinations. (AR 25.) Unlike the Revels court which found that the ALJ had erred by finding that there was no objective evidence to support the limitations opined due to the presence of tender points, the physical examination findings in the record do not make such findings. As the ALJ found, review of the longitudinal record demonstrates few findings that would support Dr. Barry's opinion. Specifically, Dr. Barry found no tenderness on examination, although he did find reduced range of cervical motion on March 21, 2016. (AR 431.) He also noted that Plaintiff needed to lose weight and depression was not a major issue. (AR 431.)

Plaintiff returned on April 5, 2016 and May 18, 2016, reporting symptoms, but there are no physical examination findings and her medications were addressed. (AR 431, 432.) At the May 18, 2016, visit, Dr. Barry noted that Plaintiff was advised to join a gym. (AR 432.) Plaintiff returned on June 21, 2016, and reported that she was doing better, sleeping better, aching less, and was more outgoing and smiling. (AR 543.) Dr. Barry did not note any tenderness. (AR 543.)

Dr. Barry saw Plaintiff on July 19, 2016 and noted that there was no triggering. (AR 543.) Plaintiff returned on August 31, 2016 and reported not doing well with general aching, fatigue, poor sleep and depression and her medications were adjusted, but there are no examination findings noted. (AR 433.) Plaintiff returned on September 27, 2016 reporting she was more depressed and could not take care of her four year old grandson. (AR 433.) There are

again no examination findings noted, and it was suggested that Plaintiff see a psychiatrist. (AR 433.)

Plaintiff saw Dr. Barry on November 16, 2016 and continued to complain of the same symptoms and that she was no longer watching her four year old grandson. (AR 433.) Dr. Barry noted that she did not review the information he provided to her on fibromyalgia, was passive and depressed seeking an easy solution. (AR 433.) There are no examination findings noted.

Plaintiff saw Dr. Barry on December 16, 2016 reporting her symptoms were unchanged. (AR 541.) Dr. Barry noted that Plaintiff had not come to grips with her fibromyalgia and has not accepted that she is an integral part of the treatment program. (AR 541.) It was emphasized that she needed to become more physically active and recommended that she join a gym. (AR 541.) Dr. Barry emphasized with Plaintiff that until she came to grips with her need to participate in her program she will not improve. (AR 541.) There are no examination findings noted. (AR 541.)

On February 7, 2017, Dr. Barry noted that Plaintiff has shown no desire to participate in the management of her fibromyalgia and he had little to offer her absent her cooperation. (AR 541.) There are no examination findings.

On April 3, 2017, Plaintiff reported that her symptoms were unchanged and she was attending her drug meetings. (AR 534.) There are no examination findings.

On May 3, 2017, Dr. Barry completed the physical source statement. (AR 487-490.) Plaintiff saw Dr. Barry on May 22, 2017, and noted that mentation, balance and coordination were normal. (AR 534.)

Plaintiff was seen on August 29, 2017, and reported that her symptoms persist in the same fashion. (AR 533.) There are no examination findings.

While Plaintiff regularly complained of pain, similarly review of the longitudinal record demonstrates that, other than some findings of hand tenderness following her carpal tunnel surgery (AR 368, 447) and some findings on July 3, 2018 (AR 635), Plaintiff had general normal examinations and there are no findings of tenderness or tender points in the record. (AR 388, 404, 420, 495, 502, 506, 528, 622.) The ALJ could reasonably find that Dr. Barry's limitations

were inconsistent with his findings and the longitudinal medical record. Further, the ALJ properly found that Dr. Barry's opinion that Plaintiff would off task for twenty five percent of a work day due to symptoms severe enough to interfere with attention and concentration was properly rejected for the same reasons addressed the same limitation set forth in Dr. Guzzetta's opinion.

The ALJ provided a specific and legitimate reasons for the weight provided to Dr. Barry's opinion that is supported by substantial evidence in the record.

### B. Plaintiff's Symptom Testimony

Plaintiff contends that the ALJ failed to provide clear and convincing reasons to reject her symptoms testimony. Plaintiff argues that the ALJ improperly found that her daily activities were inconsistent with a finding of disability and the only other reason provided was inconsistency with the medical record which is also flawed. Defendant counters that the ALJ properly evaluated Plaintiff's symptom testimony and provided clear and convincing reasons to discount her testimony. Plaintiff replies that the ALJ did not make any findings of how her limited activities are inconsistent with her alleged symptoms, did not explain how the medical records are inconsistent with her testimony, and her testimony cannot be rejected on the sole ground that it is not corroborated by the objective medical evidence. Further, Plaintiff argues that Defendant is offering post hoc rationalizations that the ALJ did not rely on in the opinion.

"An ALJ is not required to believe every allegation of disabling pain or other non-exertional impairment." Orn, 495 F.3d at 635 (internal punctuation and citations omitted). Determining whether a claimant's testimony regarding subjective pain or symptoms is credible, requires the ALJ to engage in a two-step analysis. Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012). The ALJ must first determine if "the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007) (internal punctuation and citations omitted). This does not require the claimant to show that her impairment could be expected to cause the severity of the symptoms that are alleged, but only that it reasonably could have caused some degree of symptoms. Smolen, 80 F.3d at 1282.

Then "the ALJ may reject the claimant's testimony about the severity of those symptoms only by providing specific, clear, and convincing reasons for doing so." Brown-Hunter v. Colvin, 806 F.3d 487, 488–89 (9th Cir. 2015). "The ALJ must specifically make findings that support this conclusion and the findings must be sufficiently specific to allow a reviewing court to conclude the ALJ rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit the claimant's testimony." Moisa v. Barnhart, 367 F.3d 882, 885 (9th Cir. 2004) (internal punctuation and citations omitted). Factors that may be considered in assessing a claimant's subjective pain and symptom testimony include the claimant's daily activities; the location, duration, intensity and frequency of the pain or symptoms; factors that cause or aggravate the symptoms; the type, dosage, effectiveness or side effects of any medication; other measures or treatment used for relief; functional restrictions; and other relevant factors. Lingenfelter, 504 F.3d at 1040; Thomas, 278 F.3d at 958. In assessing the claimant's credibility, the ALJ may also consider "(1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; [and] (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment. . .." Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008) (quoting Smolen, 80 F.3d at 1284). The district court is constrained to review those reasons that the ALJ provided in finding the claimant's testimony not credible. Brown-Hunter, 806 F.3d at 492.

The ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms prior to the date last insured, but her statements concerning the limiting effects of her symptoms were not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in the decision. (AR 22.)

The ALJ considered a July 3, 2016 function report completed by Plaintiff. (AR 21, 258-265.) Plaintiff asserted that she could not work due to chronic pain throughout her body (AR 21, 258.) Plaintiff reported that she woke up and was unable to get out of bed for about an hour. (AR 259.) She found it difficult to put on her tops, to wash and do her hair, to wash her body, and she had difficulty shaving because it was hard to bend. (AR 259.) Plaintiff stated she did

not prepare her own meals, but contrarily stated that on a good week she prepared meals two to three times and only once in a bad week. (AR 260.) She stated it took her one hour to prepare a meal. (AR 260.) She could not prepare meals because it was hard to use a knife and open containers. (AR 260.) Plaintiff did laundry on a good day but did not do any outside work or ironing. (AR 260.) On a good day it would take her about one and a half hours to do laundry, and on a bad day she would spend three hours doing laundry. (AR 260.) Her husband would remind her to lean on things and take her time. (AR 260.) Plaintiff stated she was unable to do house or yard work because she was not able to bend or lift because of her weak hand and her feet hurt. (AR 261.)

Plaintiff stated she did not spend her day inside. (AR 261.) Her feet hurt when she stood and she had lots of depression. (AR 261.) Plaintiff was able to ride in a car and her sister took her where she needed to go. (AR 261.) Plaintiff did not drive because her hands bothered her and she was too depressed and suffered from anxiety. (AR 261.) Plaintiff's sister would take her to shop in stores or Plaintiff's husband would do the shopping. (AR 261.) Plaintiff went shopping about two to three times per month. (AR 261.) Her husband takes care of the bills and her ability to handle money had not changed since her condition began. (AR 261-262.)

Plaintiff's hobbies were reading and watching television. (AR 262.) She watched television daily. (AR 262.) Plaintiff did not spend much time with others due to her depression. (AR 262.) She would spend time with others two to three times per month. Plaintiff stated she did not go anywhere on a regular basis but went places at least two times per week with her sister, husband, or daughter. (AR 262.)

Plaintiff does not have any problems getting along with people but does not have much of a social life due to her depression, anxiety, and pain. (AR 263.) Plaintiff had difficulty lifting, squatting, bending, standing, walking, kneeling, climbing stairs, using her hands and getting along with others, as well as difficulty with memory, completing tasks and concentration. (AR 263.) She reported she cannot do any heavy lifting due to pain, lack of motivation, depression and anxiety and preferred to be by herself in bed. (AR 263.) Plaintiff can walk for thirty minutes on a good day and then needs to rest for twenty minutes. (AR 263.) She can pay

attention for twenty minutes and does not finish what she starts.  (AR 263.)  Plaintiff does not have any problems following written instructions on a good a day and is unsure on a bad day.  (AR 263.)  She can follow spoken instructions pretty well but lacks motivation.  (AR 263.)  Plaintiff gets along with authority figures and has never been fired or laid off from a job.  (AR 263.)

She stated she was not handling stress well at the moment and did not want to do anything stressful.  (AR 264.)  She does not handle changes in routine well.  (AR 264.)  She was fearful of taking narcotics for her pain due to her past addiction.  (AR 264.)  Plaintiff was taking medication which caused side effects of constipation, insomnia, fatigue, dizziness, stomach aches, dry mouth, sleep, dark urine, weight change, confusion, and light headedness when getting up.  (AR 265.)

The ALJ also considered that at the hearing, Plaintiff testified she was unable to work primarily due to diffuse body pain, urinary incontinence, and anxiety.  (AR 21.)  She stated she could only stand for about forty five minutes at one time, could sit for about thirty minutes at one time, and could walk about one block before needing to rest.  (AR 21.)  She reported that she was able to prepare meals and do laundry without assistance, but her sister helped her with household chores.  (AR 21.)

The ALJ noted "that there are some inconsistencies between the claimant's allegations and her self-reported daily activities prior to the date last insured."  (AR 21.)

> Specifically, while the claimant has alleged that she was limited in her ability to work at any exertional level, the record reflects that she can perform at least some activities of daily living, such as preparing meals, laundering clothes, and grocery shopping with assistance.  While such activities are not determinative of the ultimate issue in the case, they are suggestive of greater function than alleged.

(AR 21 (internal citation omitted).)  The ALJ also found Plaintiff's assertion that she was unable to work to be inconsistent with the medical record and probative mental health examinations that showed normal or largely unremarkable physical and mental examinations during the relevant period.  (AR 21.)

Defendant argues that the ALJ could properly discredit Plaintiff's testimony regarding her daily activities where they contradict her claim of a totally debilitating impairment.  "[T]he

mere fact that a plaintiff has carried on certain daily activities . . . does not in any way detract from her credibility as to her overall disability." Orn, 495 F.3d at 639 (citing Vertigan v. Halter, 260 F.3d 1044, 1050 (9th Cir. 2001)). In addressing the claimant's testimony, "the ALJ must specifically identify the testimony she or he finds not to be credible and must explain what evidence undermines the testimony." Holohan v. Massanari, 246 F.3d 1195, 1208 (9th Cir. 2001). "Inconsistencies between a claimant's testimony and the claimant's reported activities provide a valid reason for an adverse credibility determination." Burrell v. Colvin, 775 F.3d 1133, 1137 (9th Cir. 2014). However, "[g]eneral findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." Burrell, 775 F.3d at 1138 (quoting Lester, 81 F.3d at 834). "To support a lack of credibility finding, the ALJ was required to point to specific facts in the record that would support the lack of credibility finding. Burrell, 775 F.3d at 1138.

Here, the ALJ found that Plaintiff's testimony that she was able to do laundry, prepare meals and shop with assistance suggested that she had greater functioning but the ALJ did not identify "which daily activities conflicted with which part of Claimant's testimony." Burrell, 775 F.3d at 1138. The ALJ did not identify any conflicts between Plaintiff's testimony to support an adverse credibility finding based on her daily activities.

While the ALJ also found that medical record was inconsistent with Plaintiff's testimony, the ALJ cannot discredit Plaintiff's pain testimony solely because it is found not to be supported by the objective medical evidence. Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001) (citing 20 C.F.R. § 404.1529(c)(2)); Bunnell v. Sullivan, 947 F.2d 341, 347 (9th Cir. 1991). The ALJ did not identify any other reasons to discredit Plaintiff's testimony. Therefore, even if there is substantial evidence to support the ALJ's finding that the clinical evaluations and objective evidence are inconsistent with Plaintiff's complaints, the ALJ could not properly reject Plaintiff's testimony for this reason alone. See Bunnell, 947 F.2d at 347.

The Court finds that the ALJ erred by failing to provide clear and convincing reasons to reject Plaintiff's symptom testimony.

///

### C.    Remand for Further Proceedings

Plaintiff seeks remand for payment of benefits arguing the three part test has been met and there is no serious doubt that she is disabled looking at the record as a whole. Defendant counters that if remand is necessary the ordinary remand rule should apply and the matter should be remanded for further proceedings.

The ordinary remand rule provides that when "the record before the agency does not support the agency action, ... the agency has not considered all relevant factors, or ... the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." Treichler v. Comm'r of Soc. Sec. Admin., 775 F.3d 1090, 1099 (9th Cir. 2014). This applies equally in Social Security cases. Treichler, 775 F.3d at 1099. Under the Social Security Act "courts are empowered to affirm, modify, or reverse a decision by the Commissioner '*with or without* remanding the cause for a rehearing.' " Garrison v. Colvin, 759 F.3d 995, 1019 (9th Cir. 2014) (emphasis in original) (quoting 42 U.S.C. § 405(g)). The decision to remand for benefits is discretionary. Treichler, 775 F.3d at 1100. In Social Security cases, courts generally remand with instructions to calculate and award benefits when it is clear from the record that the claimant is entitled to benefits. Garrison, 759 F.3d at 1019.

The Ninth Circuit has "devised a three-part credit-as-true standard, each part of which must be satisfied in order for a court to remand to an ALJ with instructions to calculate and award benefits: (1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand." Garrison, 759 F.3d at 1020. The credit as true doctrine allows "flexibility" which "is properly understood as requiring courts to remand for further proceedings when, even though all conditions of the credit-as-true rule are satisfied, an evaluation of the record as a whole creates serious doubt that a claimant is, in fact, disabled. Id. at 1021. Even when the

circumstances are present to remand for benefits, "[t]he decision whether to remand a case for additional evidence or simply to award benefits is in our discretion." Treichler. 775 F.3d at 1102 (quoting Swenson v. Sullivan, 876 F.2d 683, 689 (9th Cir. 1989)).

The ALJ failed to provide clear and convincing reasons to reject Plaintiff's symptom testimony. However, "a reviewing court is not required to credit claimants' allegations regarding the extent of their impairments as true merely because the ALJ made a legal error in discrediting their testimony." Treichler, 775 F.3d at 1106. It is only where "there are no outstanding issues that must be resolved before a determination of disability can be made," that the court has the "discretion to credit a claimant's testimony as true and remand for benefits, and only then where 'it is clear from the record that the ALJ would be required to find [the claimant] disabled' were such evidence credited." Id.

Viewing the totality of the evidence in the record, the Court disagrees with Plaintiff's assertion that there is no serious doubt that Plaintiff is disabled and finds that remand for further consideration is warranted. While the ALJ did err by failing to provide clear and convincing reasons to reject Plaintiff's pain testimony, "[a] claimant is not entitled to benefits under the statute unless the claimant is, in fact, disabled, no matter how egregious the ALJ's errors may be." Strauss v. Comm'r of the Soc. Sec. Admin., 635 F.3d 1135, 1138 (9th Cir. 2011). Review of the record raises a doubt as to whether Plaintiff is disabled.

Specifically, while Plaintiff's July 3, 2016 function reported asserted that she had numerous limitations due to pain and depression, there is evidence in the record that Plaintiff reported improvement with her medication which was controlling her symptoms of depression during 2012 and 2013. (AR 326, 329, 333, 335, 338.) After Plaintiff was released from prison, she returned to treatment with Dr. Guzzetta in 2015 and on August 3, 2015, reported that everything was going well and she felt great. (AR 353.) She denied any anxiety or depression. (AR 353.) She continued to report improvement through March 2016. (AR 356, 359, 362.) It also appears that Plaintiff was taking care of her four year old grandson until September 2016. (AR 433, 542.) Additionally, as defendant points out there is substantial evidence discussed above that Plaintiff was non-complaint with treatment recommendations from her treating

rheumatologist, Dr. Barry.  (AR 433, 541.)  Viewing this along with the objective findings in the medical record, there remains a question as to whether Plaintiff is actually disabled. Accordingly, this matter shall be remanded for the ALJ to address Plaintiff's symptom testimony.

The ALJ is advised that the Social Security regulations require the Commissioner to set forth a discussion of the evidence, and the reason or reasons upon which the decision is based. 42 U.S.C. § 405(b)(1)).  The agency must explain its reasoning in order for the Court to be able to perform a meaningful review.  The Ninth Circuit has held that to meet the burden, the ALJ must "specifically identify the testimony [from a claimant] she or he finds not to be credible and . . . explain what evidence undermines the testimony."  Treichler, 775 F.3d at 1102 (quoting Holohan, 246 F.3d at 1208).  Accordingly, "[g]eneral findings are insufficient" for an ALJ to meet the burden of setting forth clear and convincing reasons to reject a claimant's testimony. Treichler, 775 F.3d at 1102.

**V.**

**CONCLUSION AND ORDER**

Based on the foregoing, the Court finds that the ALJ did not err in the weight provided to her treating physicians' opinions, but did err by failing to identify clear and convincing reasons to reject her symptom testimony.  Accordingly, IT IS HEREBY ORDERED that Plaintiff's appeal from the decision of the Commissioner of Social Security is GRANTED IN PART and this matter is remanded back to the Commissioner of Social Security for further proceedings consistent with this order.

IT IS SO ORDERED.

Dated:   **May 17, 2021**

UNITED STATES MAGISTRATE JUDGE